IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
NORTHERN DIVISION

**SAJAWAL ALI SOHAIL,**

    **Plaintiff,**

v.                                                  Civil Case no.: 1:25-cv-40 Kleeh

**KRISTI NOEM, in her official capacity as**
Secretary of the U.S. Department of Homeland Security;
**TODD LYONS, in his official capacity as Acting Director**
of U.S. Customs and Immigration Enforcement; and
**PAMELA BONDI, in her official capacity as Attorney**
General of the United States,

    **Defendants.**

ELECTRONICALLY FILED
4/24/2025
U.S. DISTRICT COURT
Northern District of WV

## COMPLAINT

### JURISDICTION AND VENUE

1. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 5 U.S.C. § 702.

2. Venue is proper in the Northern District of West Virginia pursuant to 28 U.S.C. § 1391(e), as this is a civil action in which Defendants are employees or officers of the United States, and the Plaintiff resides in the Northern District of West Virginia.

3. This Court is authorized to grant the requested relief under 5 U.S.C. § 706, 28 U.S.C. §§ 2201-2202, 28 U.S.C. § 1651, and the Court's equitable powers.

### PARTIES

4. Plaintiff Sajawal Ali Sohail ("Ali") is a twenty-five-year-old undergraduate student at West Virginia University in Morgantown, West Virginia. Prior to the acts of the Defendants, described herein, he was studying in West Virginia pursuant to the F-1 Student Program.

5. Defendant Kristi Noem is the Secretary of the Department of Homeland Security [hereinafter "DHS"]. She is sued in her official capacity.

1

6. Defendant Todd Lyons is the Acting Director of the Immigration and Customs Enforcement [hereinafter "ICE"], a component of DHS. He is sued in his official capacity.

7. Defendant Pam Bondi is the Attorney General of the United States. She is sued in her official capacity.

## STATEMENT OF FACTS

8. Sajawal Ali Sohail is a citizen of Pakistan, who first came to the United States to study at Richard Bland College at William and Mary in Virginia. Mr. Sohail applied for and received an F-1 visa and F-1 nonimmigrant status to attend college in the United States in 2018.

9. While at Richard Bland College, Ali studied computer science, but his true passion was soccer. He had played soccer throughout his life and was ecstatic to play for a team at a United States college.

10. Mr. Sohail studied at Richard Bland College for one year before receiving an offer to transfer to Potomac State University in West Virginia. This transfer offered Ali a chance to access a more affordable education. Mr. Sohail played soccer and attended Potomac State University for the first semester of his sophomore year.

11. After the first semester of his sophomore year, Mr. Sohail received a generous scholarship offer from West Virginia University in Morgantown. While this scholarship would require that Mr. Sohail abandon competitive college soccer, he was excited about the opportunity to pursue his computer science degree at WVU. Ultimately, he accepted the offer and enrolled in January 2020.

12. Shortly after Mr. Sohail's enrollment at WVU came the original breakout of the Covid-19 pandemic. After only about three months of in-person studies, Mr. Sohail left West Virginia to go be with his family in Pakistan. He did, however, continue to maintain his student status and studies by taking online courses for the next one and a half years, after which, Mr. Sohail

returned to West Virginia on a renewed F-1 visa issued June 24, 2022.

13.     Toward the conclusion of his college semester, on December 9, 2022, WVU police reached out to Mr. Sohail, asking him to come to the police station. Mr. Sohail did not know what this request was in reference to, but, knowing that he had not engaged in any unlawful behavior, he chose to voluntarily go the station and speak to the officers as requested.

14.     Officers showed Mr. Sohail a photograph of someone and asked whether he knew the person. When Mr. Sohail replied he had no knowledge of this person, officers instructed him to speak to his family to ask whether they knew the person. The officers told Mr. Sohail to return on Monday with any information he could possibly obtain.

15.     Mr. Sohail called his family as instructed, gathering what information he could. The following Monday, December 12, 2022, Mr. Sohail voluntarily returned to the WVU police station a second time to provide the officers more information. An officer arrested Mr. Sohail on the spot, without listening to any of the information, charging him with identity theft, first as a misdemeanor and later as a felony.

16.     That same day, December 12, 2022, Mr. Sohail was taken before a judge and instructed to return with a lawyer.

17.     After being released, Mr. Sohail spoke to his father. It became clear that their family was not the perpetrator of a crime—they were victims of one. Sajawal's father had been paying for his son's tuition at WVU. When Fall 2022 tuition came due, money was tight for the Sohails. A business acquaintance offered to front the Sohail family the funds to pay the tuition by the deadline, with the understanding that the family would pay him back on a payment plan. The lender appeared to have paid the tuition as agreed, and the Sohails began sending repayments as they had agreed.

18.     However, unbeknownst to the Sohail family, the individual entrusted to make the

payment was a scammer, who used stolen information to make the payment. It was only after the Sohails had transferred thousands of dollars to this lender that the original payment to the university bounced. The scammer made off with the Sohail family's funds that they had 'repaid' – funds intended to finance their son's a education in the United States

19. After the ruse was discovered, WVU reversed the charges that had been made by this scammer, and Sajawal and his father paid the full tuition. Mr. Sohail's family therefore had to pay the tuition after having already made payments to the scammer, meaning that his family suffered a financial loss as a result of this scam.

20. Ultimately, all charges against Mr. Sohail were dismissed and he was not subject to any further action by the criminal justice system.

21. The theft committed against Mr. Sohail's family was reported to Pakistani police, which resulted in the identification of the scammer, Mansoor Alam, who had stolen from numerous individuals and was on the run from law enforcement. The Sohail family never recouped their financial losses.

22. Sajawal was rattled by this experience. Not only had his family lost a significant sum of money to a scam artist, he had also been falsely accused by the WVU police department. Despite this, he rededicated himself to his education, and continued to pursue his computer science degree.

23. Mr. Sohail was slated to graduate in May 2025, and, in preparation for his graduation, he applied to attend graduate school for journalism at WVU.

24. Mr. Sohail also submitted an application for Optional Practical Training [hereinafter "OPT"] which would permit him to work in the United States on a temporary basis in employment related to his field of study. If Mr. Sohail did not apply for OPT, or otherwise be admitted to a program for graduate study, he would be required to leave the United States within

a 60-day grace period at the conclusion of his educational program pursuant to 8 C.F.R. § 214.2(f)(5)(iv). If approved for OPT, he would be permitted to work in a related field for 12 months, with the option to extend that period by an additional 24 months because of his STEM degree.

25. Mr. Sohail had no further issues until April 10, 2025, when he received an email notifying him that his SEVIS record had been terminated:

> A review of our systems shows your SEVIS record has been terminated. The reason given was "OTHER – Individual identified in criminal records check and/or has had their VISA revoked. SEVIS record has been terminated."
> Unfortunately, we cannot provide any further insight into the termination reason and are unable to reverse this decision by the U.S. federal government.
> With the termination of your record, you have lost F-1 status, any EAD cards related to F-1 status are no longer valid for work authorization, and your I-20 is no longer valid for immigration status, travel, or visa purposes. However, we strongly recommend that you keep the original copies of your I-20s for your records. We recommend you (and any F-2 dependents) depart the US immediately. You would not be eligible in this circumstance for any additional period to remain in the United States before departure.
> Remaining in the U.S. without lawful immigration status may result in fines, detention, and/or removal (deportation), and could also impact eligibility for future U.S. visas. If you wish to appeal your termination, we can provide referrals to outside resources that may be able to help including resources through the WVU Immigration Law Clinic. However, we caution against remaining in the country while you are out of status.
> Given this sudden notice and the approaching end of the semester, we encourage you to speak with your instructors about the possibility of completing your courses remotely. We do realize the sudden impact this has on you, your academic career and your future plans. Carruth Center counselors are available to speak with you and to assist with what you may be feeling. Please consider reading out to them if needed.
> If you have questions concerning your SERVIS record, your ability to depart immediately, or returning to student status or the U.S. in the future, please do not hesitate to contact us as isss-students@mail.wvu.edu. Our advisors can assist you with questions or refer you to University resources.

26. As a result of these actions, Mr. Sohail has not been permitted to attend in-person classes, a heavy burden to bear as he attempts to finish his final semester of his undergraduate

education. He also has not been able to apply for employment though OPT, which will leave him unemployed after graduation, at great personal and financial loss.

### *Relationship Between F-1 Student Visas, Nonimmigrant Status, and SEVIS Records*

27. When an international student is accepted into an approved educational program, they must apply for admission into the United States. For many students, including Mr. Sohail, this means seeking admission through the F-1 student program.

28. The F-1 student program is administered by the Department of Homeland Security's Student and Exchange Visitor Program [hereinafter "SEVP"]. SEVP maintains SEVIS, a database which documents the status of students whose presence is legally authorized pursuant to an educational visa.

29. While SEVIS documents the legal status of an international student, senior government officials have repeatedly represented to federal courts that the termination of a SEVIS record does not inherently terminate an individual's nonimmigrant status. In a sworn affidavit provided by a senior official within the National Security Division for Homeland Security Investigations represented to a Federal Court in the Eastern District of Michigan that:

> [t]erminating a record in SEVIS does not terminate an individual's nonimmigrant status in the United States. The statute and regulations do not provide SEVP the authority to terminate nonimmigrant status by terminating a SEVIS record … Furthermore, the authority to issue or revoke visas for nonimmigrant students lies with the Department of State, not SEVP. Terminating a record within SEVIS does not effectuate a visa revocation.

30. Pursuant to these representations by DHS officials, it would be possible for an international student to have a terminated SEVIS record, but an active F-1 nonimmigrant student status.

31. In addition to the requirements placed on students, federal regulations establish recording and recordkeeping obligations on each SEVP-certified school. 8 C.F.R. § 214.3(g).

Many of these obligations placed on schools affirmatively require that they update a student's SEVIS record. For example,

- Schools must use SEVIS to issue a Form I-20 pursuant to 8 C.F.R. § 214.2(f)(iii);

- Schools must use SEVIS to authorize an F-1 student to drop below a full course of study pursuant to 8 C.F.R. § 214.2(f)(6)(iii);

- Schools must use SEVIS to grant a program extension pursuant to 8 C.F.R. § 214.2(f)(7)(iv);

- Schools must use SEVIS to facilitate the transfer of a student between schools pursuant to 8 C.F.R. § 214.2(f)(8);

- Schools must use SEVIS to permit a student to engage in off-campus employment as the result of hardship pursuant to 8 C.F.R. § 214.2(f)(9)(ii)(d);

- Schools must use SEVIS to permit a student to engage in curricular practical training pursuant to 8 C.F.R. § 214.2(f)(10);

- Schools must use SEVIS to apply for a 24-month extension of OPT for individuals with a STEM degree pursuant to 8 C.F.R. § 214.2(f)(10)(ii)(c)(2)(iii);

- Schools must use SEVIS to update a student's address within 21 days of being informed that the student has moved pursuant to 8 C.F.R. § 214.2(f)(17).

For each of these routine actions, access to SEVIS is not optional, it is the only mechanism by which those actions may be initiated.

32. At the time he was informed that his SEVIS record had been terminated, Mr. Sohail was preparing for his graduation. That preparation included submitting his application for graduate studies at WVU as well as an application for OPT, a program to which he is entitled to apply and that would permit him to remain in the country for up to three additional years to work in a job related to his field of study.

33. OPT represents a significant opportunity for Mr. Sohail; it would significantly increase his earning potential, as he will likely earn more in the United States than he would as a computer scientist in his home country of Pakistan.

34. If the representations made by DHS officials are accurate and students whose SEVIS records have been terminated have retained their F-1 status, then that termination has restricted students, including Mr. Sohail, from enjoying the full benefits of his legal F-1 status.

35. The actions of the Defendants also pose risk to educational institutions, including West Virginia University. Federal regulations acknowledge the precarious circumstance that schools may find themselves in should they fail to adequately balance their obligations both to their international students as well as to the federal government. *See* 8 C.F.R. § 214.4 (Schools are obligated to their students to provide the programs of study to which they have committed themselves in the students' application for enrollment and acceptance process. Schools are obligated to the U.S. government to comply with the recordkeeping, retention, reporting and other requirements contained in 8 C.F.R. § 214.3.")

36. Mr. Sohail's lease expires at the end of April, and he is moving to another apartment in Morgantown, West Virginia. This move triggers a mandatory reporting requirement on the part of the University, meaning that the school would find itself in a paradox if it is true that Plaintiff has legal F-1 status despite the termination of his SEVIS record. The university would be obligated to make a report through SEVIS for a student with legal F-1 status, but unable to do so as the SEVIS account for the student has been terminated.

37. Similarly, if termination of a SEVIS account does not communicate the end of legal F-1 status, then a University with an enrolled F-1 student who has a terminated SEVIS account would not have a mechanism by which they would be able to report the termination of attendance of each nonimmigrant student as required by 8 U.S.C. § 1101(a)(15)(F)(i). The penalty for failure

8

to report termination of status can be harsh – the withdrawal of SEVP certification and, consequently, the ability to host international students.

38.     If the representations by the Defendants are accurate and students who have had SEVIS records terminated retain their legal F-1 status, then a great injustice has been done to the students who are not able to receive the full benefit of that legal status, to the universities that now bear substantial legal risk, and the relationships which existed between students and their universities which have now been unduly restricted by government action.

39.     For Mr. Sohail, the consequences are clear. If he has retained his F-1 status, he has been unable to attend his courses in the final weeks of his studies. He has been unable to pursue graduate school and/or OPT, losing potential earnings and long-term career benefits as a result.

***Termination of Plaintiff's F-1 Status is Unlawful***

40.     Should the Defendants allege that Plaintiff's F-1 status has been terminated, such an act would be blatantly and unquestionably unlawful. SEVP regulations distinguish between two ways that a student may fall out of status: (1) a student who "fails to maintain status;" and (2) an agency-initiated "termination of status." *See* 8 C.F.R. § 214.2(f).

41.     Students fail to maintain their F-1 student status when they do not comply with the regulatory requirements of F-1 status, such as failing to maintain a full course of study without prior approval, engaging in unauthorized employment, or other violations of the requirements under 8 C.F.R. § 214.2(f). In addition, 8 C.F.R. § 214.1(e)-(g) outlines specific circumstances where certain conduct by any nonimmigrant visa holder, such as engaging in unauthorized employment, providing false information to DHS, or being convicted of a crime of violence with a potential sentence of more than a year "constitute a failure to maintain status."

42.     The only information that Mr. Sohail received about the supposed termination of his status was that his SEVIS record indicated that the termination was classified as "OTHER –

Individual identified in criminal records check and/or has had their VISA revoked."

43. Having been identified in a criminal record check is not a lawful ground for termination pursuant to 8 C.F.R. § 214.1(e)-(g). Further, Mr. Sohail has been convicted of no crime – to the contrary, his family was the victim of a crime which resulted in legal action on their behalf in Pakistan, and for which all charges against Mr. Sohail were promptly dismissed.

44. Similarly, revocation of a visa is not a failure to maintain status. DHS's own policy guidance confirms that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record." U.S. Immigration and Customs Enforcement, Policy Guidance 1004-04 – Visa Revocations (June 7, 2010). Rather, if the visa is revoked, the student is permitted to continue their course of study in school, and it is only upon departure from the United States that their SEVIS record is terminated. After that occurs, the student would need to obtain a new visa from a consulate or embassy abroad if they wish to re-enter the United States. *See* U.S. Department of State, Guidance Directive 2016-03, 9 FAM 403.11-3: VISA REVOCATION (Sept. 12, 2016).

45. Mr. Sohail has complied with all laws and regulations concerning his visa and his immigration status since its issuance. He has not failed to maintain status within the plain meaning of the law and therefore is not subject to termination of his F-1 status pursuant to 8 C.F.R. § 214.2(f).

46. Agency-initiated termination is even more limited. Pursuant to 8 C.F.R. § 214.1(d), DHS can terminate F-1 student status only when: (1) a previously granted waiver under 8 U.S.C. § 1182(d)(3) or (4) is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. These grounds are plainly inapplicable to the case at hand.

*Defendants' Disregard for Widespread Harm*

47.     While the purposes and intent behind Defendants' actions may be beyond the scope of consideration of this Court, and their basis so specious as to defy credibility, the impact is clear. Across the United States, talented and promising international students are having their dreams torn asunder, mere inches from the finish line. These students have traveled far, studied hard, and paid significant tuition into the United States economy, whilst enriching the scholarship and culture of our academic institutions, only to be denied the credentials they worked so hard to achieve, for capricious and arbitrary reasons.

48.     The unlawful terminations are part of a clear policy and pattern/practice, whether written or not, perpetuated by Defendants to cancel the status of hundreds, if not thousands, of immigrant students nationwide, or, in the alternative, sow such chaos and confusion that F-1 students with otherwise legal status believe that they are required to self-deport.

49.     On April 7, 2025, Inside Higher Ed, an industry publication, had already reported 147 terminations at 48 different educational institutions and indicated that this estimate was "almost certainly a fraction of the total" because "[m]any . . . colleges are reluctant to publicly confirm any student visa revocations [because they are] anxious to avoid attracting federal scrutiny and uncertain how to navigate an increasingly fraught gray zone." Liam Knox, Student Visa Dragnet Reaches Small Colleges, Inside Higher Ed (Apr. 8, 2025), https://www.insidehighered.com/news/global/international-students-us/2025/04/08/trump-admin-broadens-scope-student-visa (accessed Apr. 22, 2025). Mass cancellations have also been documented in numerous news sources.

50.     The timing and uniformity of these terminations leave little question that DHS has adopted a nationwide policy, whether written or not, of mass termination of student status in SEVIS. While the exact details of the policy are not currently known, the experience of Plaintiff

and of other publicly reported cases strongly suggests that the terminations are being indiscriminately made based upon any information that a given student has had some kind of encounter with a law enforcement official, no matter how innocuous, or a prior encounter with immigration agents even if that encounter did not involve unlawful conduct.

## COUNT 1
### Violation of Fifth Amendment – Procedural Due Process
*SEVIS Termination*

51. The foregoing allegations are realleged and incorporated herein.

52. The United States Constitution requires notice and a meaningful opportunity to be heard before being deprived of rights and interests that can be withdrawn only for cause by law. *See Scorteanu v. I.N.S.*, 339 F.3d 407, 413 (6th Cir. 2003) (due process entitles noncitizens to "notice that is reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

53. The law, namely 8 C.F.R. § 214.1(d), provides the specific bases upon which an immigrant student's F-1 status can be terminated by DHS.

54. Through termination of Plaintiff's SEVIS record, Defendants unlawfully deprived him of the ability to benefit from his legal entitlement to his F-1 status.

55. Defendants terminated the Plaintiff's SEVIS record without (i) notifying him of the termination decision and the reasons for it, (ii) providing him an individualized hearing before an impartial adjudicator, and (iii) providing him with adverse evidence and an opportunity to confront and respond to such evidence.

56. Plaintiff has suffered, and continues to suffer, ongoing harm as a result of this deprivation.

57. Defendants' disregard for complying with the well-established due process principles violated Plaintiffs' due process rights.

12

## COUNT 2
### Violation of Fifth Amendment – Procedural Due Process
*F-1 Student Status Termination*

58. The foregoing allegations are realleged and incorporated herein.

59. If the Defendants' position is that SEVIS account deletion is not equivalent to an F-1 Student Status termination, Defendants must be estopped from continued deletion of Plaintiff's SEVIS account, as the SEVIS record is the sole means for schools to determine legal student status. In the alternative, if Defendants allege that Plaintiff's F-1 Student Status has been terminated, this termination was capricious and improper.

60. The United States Constitution requires notice and a meaningful opportunity to be heard before being deprived of rights and interests that can be withdrawn only for cause by law. *See Scorteanu v. I.N.S.*, 339 F.3d 407, 413 (6th Cir. 2003) (due process entitles noncitizens to "notice that is reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

61. The law, namely 8 C.F.R. § 214.1(d), provides the specific bases upon which an immigrant student's F-1 status can be terminated by DHS.

62. Defendants terminated the Plaintiff's F-1 status without (i) notifying him of the termination decision and the reasons for it, (ii) providing him an individualized hearing before an impartial adjudicator, and (iii) providing him with adverse evidence and an opportunity to confront and respond to such evidence.

63. Plaintiff has suffered, and continues to suffer, ongoing harm as a result of this deprivation.

64. Defendants' disregard for complying with the well-established due process principles violated Plaintiffs' due process rights.

## COUNT 3
### Violation of Administrative Procedure Act
*(Unlawful Terminations of Plaintiff's F-1 Student Statuses)*

65. The foregoing allegations are realleged and incorporated herein.

66. Defendants' termination of Plaintiff's F-1 student status is a final agency action. *See Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 182 (3d Cir. 2019) ("The order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order[.]").

67. Defendants' termination of Plaintiff's F-1 student status violates the Administrative Procedure Act (APA) and should be set aside pursuant to 5 U.S.C. § 706(2) as arbitrary, capricious, an abuse of discretion, contrary to constitutional right, contrary to law, in excess of statutory jurisdiction, and in violation of the Accardi doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy,* 347 U.S. 260 (1954).

68. Under 8 C.F.R. § 214.1(d), Defendants have no statutory or regulatory authority to terminate Plaintiff's F-1 student status based on the justifications provided. Nothing in Plaintiffs' criminal history, academic record, or other applicable history or record provides a statutory or regulatory basis for termination or a determination that Plaintiff has failed to maintain his F-1 status.

69. Additionally, in making its determination that each Plaintiff's student status should be terminated, Defendants did not consider any facts relevant to Plaintiff's individual circumstances nor did it provide any explanation, let alone reasoned explanation, justifying its determination. As a result, Defendants arbitrarily and capriciously terminated Plaintiff's F-1 student status.

70. Moreover, Defendants terminated Plaintiff's F-1 student status without affording them meaningful notice and an opportunity to be heard, contrary to Plaintiffs' constitutional right to procedural due process.

71. Therefore, Defendants' termination of Plaintiff's F-1 student status is arbitrary and

capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706(2). It is also not in accordance with DHS's own rules.

## COUNT 4
### Violation of Administrative Procedure Act
*(Unlawful Terminations of Plaintiff's SEVIS Status)*

72. The foregoing allegations are realleged and incorporated herein.

73. Defendants' termination of Plaintiff's SEVIS status deprives him of the ability to Benefit meaningfully from his F-1 student status, and as such is a final agency action. Defendants' termination of Plaintiff's F-1 student status is a final agency action. *See Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 182 (3d Cir. 2019) ("The order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order[.]").

74. Defendants' termination of Plaintiff's SEVIS status violates the Administrative Procedure Act (APA) and should be set aside pursuant to 5 U.S.C. § 706(2) as arbitrary, capricious, an abuse of discretion, contrary to constitutional right, contrary to law, in excess of statutory jurisdiction, and in violation of the Accardi doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy,* 347 U.S. 260 (1954).

75. Defendants have no statutory or regulatory authority to terminate SEVIS status based on the justifications provided. Nothing in Plaintiff's criminal history, academic record, or other applicable history or record provides a statutory or regulatory basis for termination or a determination that Plaintiff has failed to maintain his F-1 status.

76. In making its determination that Plaintiff's SEVIS status should be terminated, Defendants did not consider any facts relevant to Plaintiff's individual circumstances nor did it provide any explanation, let alone reasoned explanation, justifying its determination. As a result, Defendants arbitrarily and capriciously terminated Plaintiff's SEVIS status.

77. Moreover, Defendants terminated Plaintiff's SEVIS status without affording them meaningful notice and an opportunity to be heard, contrary to Plaintiffs' constitutional right to procedural due process.

78. Therefore, Defendants' termination of Plaintiff's SEVIS status is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706(2). It is also not in accordance with DHS's own rules.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:
1. Assume jurisdiction over this matter;
2. Enter judgment in favor of Plaintiff and against Defendants;
3. Declare that Defendants' termination of Plaintiff's F-1 student status in SEVIS without affording him sufficient notice and opportunity to be heard violated Plaintiff's Fifth Amendment procedural due process rights;
4. Declare that Defendants' termination of Plaintiff's F-1 student status violated Plaintiff's Fifth Amendment procedural due process rights or, in the alternative, declare that Plaintiff's F-1 student status has not been terminated;
5. Declare that Defendants' termination of Plaintiff's F-1 student status violated the Administrative Procedure Act;
6. Declare that Defendants' termination of Plaintiff's SEVIS status violated the Administrative Procedure Act;
7. Issue a temporary restraining order, followed by a preliminary and permanent injunction as to Defendants:
   a. Requiring them to restore Plaintiff's valid F-1 student status to the extent that such status has been terminated;
   b. Requiring them to restore Plaintiff's valid, active F-1 status in their SEVIS record;
   c. Requiring them to process Plaintiff's request for OPT and process and award his Employment Authorization Document as would have occurred if Defendants had not engaged in the above-described unlawful action;
   d. Prohibiting them from arresting, detaining, or transferring Plaintiff out of this Court's jurisdiction, or ordering the arrest, detention, or transfer of Plaintiff out of this Court's jurisdiction;
   e. Prohibiting them from initiating removal proceedings against or deporting any Plaintiff on the basis of the termination of their F-1 student status;
   f. Vacate and set aside Defendants' policy and/or pattern-and-practice of unilaterally terminating students' F-1 student status in SEVIS for reasons that do not rise to the level required for termination under 8 C.F.R.§ 214.1.

8. Award Plaintiff attorney fees and other litigation costs pursuant to the Equal Access to Justice Act and/or any other applicable law; and
9. Grant such further relief as the Court deems just and proper.

/s/ Aubrey Sparks
Aubrey Sparks (WV Bar # 13469)
American Civil Liberties Union of West Virginia
PO Box 3952 Charleston, WV 25339-3952
Phone: (304) 202-3435
asparks@acluwv.org
*Counsel for Plaintiff*